WALTER M. ELSWICK, Judge.
On the morning of September 10, 1940, near the hour of seven, Bert Canterbury was picked up by a state road truck driver in front of Canterbury’s home at the mouth of Goodman Branch, three miles below the City of Williamson, in Mingo county, West Virginia. The cab of the state road truck was occupied by the driver, Clyde Hardin, and Ralph Allen, both employees of the state road commission of West Virginia. They were on their way to work on a state road project on Trace creek in said county.
At that time there was also a w. p. a. project in operation about one to three miles below the state road project on said creek. Bert Canterbury for some time prior thereto, and on said 10th day of September, 1940, was a w. p. a. employee and had orders from both the w. p. a. foreman and the state road foreman on said projects to work at the state road project as driller under the supervision of Ralph Allen one of the occupants of the state road truck in which he, Canterbury, was being driven.
After the said state road truck had traveled eight or nine miles toward their place of work and came to a sharp down grade curve, upon approaching Naugatuck bridge the driver lost control of the truck, where it skidded against the bridge abutments, turned over, and fell about thirty-eight feet into Pigeon creek. Bert Canterbury was riding in the back end or body of the truck, and the truck with its contents of cement, oil drums and cans fell upon him, killing him instantly.
From the evidence it appears that on the morning in question it was raining and the road over which the truck was being driven was wet and slippery. It also appears that the driver of the truck was at the time of the collision and for some time *175 prior thereto driving the truck at a reckless rate of speed, although he knew the condition of the road and that “the worst curve that there was on that stretch of road” was at the point where the collision occurred (record p. 123). Ralph Allen, the occupant of the cab of the truck, testified that he had protested and requested the driver not to drive so fast, down the road about a mile before coming to the bridge where the collision occurred; that he had then remonstrated the driver that the road was slippery and dangerous; that the driver replied that there was no danger, and that the road was all right. (Record p. 89). Other witnesses who were along the highway where the truck had passed testified that in their opinion the truck was being driven, when passing them, from 50 to 55 miles per hour. (Record pp. 14 and 28). One witness who viewed the collision, was attracted by the noise from'the truck, and speed it was making, immediately prior to the collision. He had had experience as a driver of automobiles and taxis and estimated the speed of the truck when coming around the curve down the hill toward the bridge to have been from 50 to 55 miles per hour. (Récord p. 54).
It appears further from the evidence that the decedent, Canterbury, was not placed in a position to view the road or to make protest against the reckless manner of driving the truck although it is doubtful, if such protest had been made, whether the driver would have heeded, when it appears that he had disregarded protests made by Allen, a short time before the time of the collision, who was in the cab and who could view the road in the direction of travel. From the evidence it appears that the truck was making a loud noise, and that there were bars around the back window of the cab of the truck.
It also appears from the evidence that the decedent, Bert Canterbury, was engaged in special work for the state road commission which distinguished his work from that of other employees of the w. p. a. project. The w. p. a. crew was digging ditches, and the state road crew was “taking a cliff off.” (Record p. 97). Canterbury was working with the state road crew, drilling rock, running the air hammer or drill (record pp. 82, *176 97). His immediate superior was Ralph Allen, who occupied the extra seat in the cab of the truck at the time Canterbury entered the truck, and when the same skidded and fell from the bridge. The state undertook to prove that state road commission officials had a standing enforced rule or regulation prohibiting truck drivers from carrying persons other than employees of the commission, unless it was equipment that it carried insurance on, such as passenger cars and pickups. The truck in question was a ton-and-a-half truck with dump body. The same truck had been used by the same truck driver to carry Canterbury home from the same project a number of times, even on the evening before he was killed. There was no evidence indicating that the truck driver had been warned against the use of the truck for the purpose, and he testified that he had not received any specific instructions not to permit the decedent to ride in the back end of the truck. (Record p. 120). Furthermore, the truck drivers had received instructions a number of times to go and get Canterbury at the w. p. A. project and transport him in the same type of truck to the state project where Ralph Allen worked. On the return trips home if another person was in the cab of the truck with the driver, Canterbury would ride in the back end of the truck (record p. 119). It doesn’t appear from the evidence in the case that Canterbury had been instructed not to ride the truck in either its cab or bed. The commission had a rule that only one person could occupy the cab with the driver which seems to explain why Canterbury was riding in the back end of the truck at the time he was killed.
It also appears from the evidence that the w. p. a. officials had regulations which prohibited its employees from being transported in vehicles which were not equipped with seats and covers. To come within their regulations dump truck beds had to be securely chained to the chassis. It appears from the evidence that neither the state nor w. p. a. regulations were enforced as to the decedent. Considering the special type of work which the decedent was doing and the instructions given him, as well as the manner in which he had been previously transported to and from the project we are of the opinion that the *177 decedent was not chargeable with contributory negligence with reference to violation of any such rules or regulations issued by either the state department or the w. p. a. Under the circumstances he no doubt believed that he was expediting his duties as an employee by reporting to work with his boss and returning to his work with the same driver who had transported him home on the evening before. And he was riding in the truck with the person to whom his w. p. a. foreman had intrusted his care while away from the w. p. a. project. He was no longer to be classified with the other w. p. a. employees in regard to the state road commission’s duty toward him. Furthermore, it was not the nature of the truck, but the careless manner by which it was being driven that caused decedent’s death.
Brookie Canterbury, as administratrix of the estate of Bert Canterbury, deceased, filed claim for the wrongful death of decedent for the sum of $10,000.00. At the close of the hearing of evidence in the case, the state of West Virginia, by its attorney general, moved that the petition be dismissed for the following grounds:
First, that the principal, state road commission, is not liable to third persons for negligence, if any, of agents who act outside the scope of their employment.
Second, even if negligence does exist, which the state road commission denies, still the evidence is uncontradicted, and corroborated in this case that the claimant was negligent in not bringing home to the truck driver a notice of the reckless way in which the truck driver operated the truck.
A third ground, namely, that the w. p. a. employee in question cannot recover in this case, as his injury was the direct result of his own disobedience of orders and regulations given to him by the w. p. a. and state road commission foremen in charge of this particular project.
As to the first ground so assigned, we are of the opinion from the evidence for the reasons hereinbefore set forth that the *178 truck driver was at the time of the collision acting within the course of his employment.
As to the second ground assigned we are of the opinion from the evidence that the truck driver was negligent and that his acts were the direct and proximate cause of the collision; the truck driver had been requested to slow down within a mile of the scene of the. collision by Ralph Allen who occupied the cab with the driver and who could view the road ahead; the decedent was not placed in a position to view the road or to remonstrate with the driver.
As to the third ground assigned we do not' find from the evidence that the decedent had received orders or regulations not to ride on the truck while working on the state project, but it appears from the evidence that he at times had received orders to ride on the truck in question by the foreman of the particular state project; that while working on the state project he was doing special work which distinguished his services from that of other w. p. a. employees who worked on the W. p. a. project.
Having found that Bert Canterbury met his death by reason of the negligence of the truck driver, in assessing the damages, we have considered evidence in the record that the Federal Government through its compensation department has been paying to Brookie Canterbury, since decedent’s death, the sum of $22.50 per month; that out of said sum $4.00 is payable to their son Evert Canterbury until he arrives at the age of 18 years; that Brookie Canterbury will continue to receive the sum of $18.50 compensation so long as she remains the widow of Bert Canterbury, deceased.
It further appears from the evidence that Bert Canterbury was 52 years of age at the time of his death; that he left surviving him his widow, Brookie Canterbury, and three children, namely: Octavia Canterbury, a daughter, 23 years of age, Sadie Canterbury, a daughter, 20 years of age, and Evert Canterbury, 17 years of age, who were all of his heirs and distrib-utees. At the time of his death he was earning wages of $42.00 *179 per month, and his family did not have any other income or means of support during his lifetime.
From all the evidence in the case we are of the opinion that the sum of fifteen hundred dollars ($1500.00) would be a fair and just award and recommend that said sum should be paid to his administratrix upon the execution of a proper bond by her to be approved by the clerk of the county court of Mingo county, West Virginia, and an order was entered accordingly.